## ST. LOUIS COUNTY, Missouri, a Body Corporate and Politic, Plaintiff-Appellant,

v.

## CHRISTIAN HOSPITAL NORTHWEST ST. LOUIS COUNTY, a Missouri Not-for-Profit Corporation, and the State Tax Commission of Missouri, Defendants-Respondents.

### No. 60667.

Supreme Court of Missouri, En Banc.

Nov. 14, 1979.

Rehearing Denied Dec. 6, 1979.

Thomas W. Wehrle, George W. Lang, II, Clayton, for plaintiff-appellant.

Bruce E. Woodruff, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, for defendants-respondents.

DONNELLY, Judge.

This is an appeal by St. Louis County from a judgment of the Circuit Court of St. Louis County entered on February 10, 1978, which affirmed a decision of the State Tax Commission declaring hospital property belonging to Christian Hospital Northwest St. Louis County exempt from taxation under Mo.Const. art. X, § 6 and § 137.100, RSMo 1978, and ordering the assessor of the County to remove the property from the assessment rolls for the year 1976.

Christian Hospital Northwest St. Louis County (Christian) is a general not-for-profit corporation with its principal place of operation in St. Louis County. Christian Hospital Northwest (the name was later changed to Christian Hospital Northeast-Northwest) is also a general not-for-profit

corporation and is the lessee and operating arm of the hospital. Christian was organized in 1972 to issue bonds to finance construction of a hospital for the benefit of St. Louis County, to lease its property to a tax-exempt corporation, and to give St. Louis County (or if the County is unable or unwilling to accept such gift, another body corporate or politic or political subdivision) all right, title and interest to the hospital after all bonds are fully paid. Financing of the hospital's construction was obtained by the issuance of $27,500,000 tax-exempt First Mortgage Bonds, series 1973. Rental payments by the lessee are sufficient to pay the principal and interest payments on the bonds.

The hospital owned by Christian and leased to Christian Hospital Northeast-Northwest opened in 1975. The main building contains approximately 363,249 square feet and has 400 acute-care beds and eighteen intensive-care beds, equipment, complete ancillary facilities, operating suites, emergency room facilities, a surgi-center for minor operations, administrative offices and physicians' offices. The facility is operated as a private not-for-profit charitable hospital for the benefit of patients residing in the service area.

The hospital building is an eleven-story building designed with a nine-story tower housing the patients' rooms and administrative offices. On the two floors of an outer structure surrounding the tower are *eleven offices* totalling 9,859 square feet leased to various physicians and to Northwest Radiologists, Inc. and Professional Opticians, Inc. These offices comprise *2.6%* of the total floor space of the hospital facility. The corridors connect the hospital proper to the physicians' offices, and in-patients frequently travel between the hospital and physicians' offices. The expense of maintaining these offices exceeded revenue by $38,762 for the period January 1, 1976, through October 31, 1976.

There are some 325 physicians on the staff of the hospital and 115 employed physicians. The physicians who lease office space in the hospital must be in a practice which "lends itself to comprehensive care." Specialists are sought for the hospital office space to supplement the general emergency room and *employed* physicians. Otherwise the hospital would be forced to hire these specialists if complete health care comparable to that in larger teaching hospitals, which have the benefit of residents, is to be achieved. Physicians in specialties which are already located in the offices have been refused as tenants. The physicians pay $7.50 per square foot per year for the offices they lease which is comparable to market rents in the area.

Physicians permitted to lease space in the hospital must also be members of the hospital staff. A physician must make application for staff privileges. When a physician is accepted to the staff, the physician must agree to serve on staff committees and to be on call on a rotation basis for emergencies in accordance with his speciality. The physicians leasing space perform work for hospital in-patients on behalf of their colleagues when the cannot be present, and are sometimes called in dire emergencies when it would take too long for the "on-call" physician to arrive, as opposed to three minutes for the officed physicians. This advantage becomes more marked when it is noted that respondent hospital has the busiest emergency room in the entire St. Louis area, treating 6,000 emergency patients each month.

The practice of including offices of private physicians in the hospital is a relatively new concept which has developed within the last ten years because it is considered "very important" to have physicians immediately available. Testimony at trial indicated that hospitals which have such offices are better "as far as the patient goes than the ones which don't," and "practically every hospital that has been built in recent time has incorporated physicians' offices." Seminars have been held by, for example, the American Hospital Association which advocate the utilization of medical office buildings in conjunction with hospital facilities. Statistics deduced at such seminars indicate that physicians with offices in a

hospital complex admit approximately 80% more patients to that hospital than do physicians with offices elsewhere. Also, the length of stay of patients that are being treated by a hospital-based physician has been found to be 1.8 days less than those being treated by outside physicians.

In June 1976 the St. Louis County Assessor notified Christian that an assessment of $246,540 was being made solely *for the physicians' offices* in the hospital. Two acres of the 24.58 acre tract, supposedly representing the doctors' suites, were assessed at $13,360 and the improvements were assessed at $233,180.

An appeal was taken to the St. Louis County Board of Equalization and in a majority decision (one judge dissenting) on August 6, 1976, the Board denied the request for tax exemption. Thereafter, respondent petitioned the State Tax Commission for review of the assessment, contending that exemption should be allowed because, *inter alia* : (1) the doctors' offices are an integral part of the hospital, (2) the use of a small portion of the facility for doctors' offices is a mere secondary and incidental use and does not deter from the primary or inherent use of the facility for charitable purposes, but is in furtherance of the charitable purposes and promotes the efficient operation thereof, and (3) previous decisions of the Commission are dispositive of the issue.

The State Tax Commission held a hearing at which a stipulation was filed, several witnesses testified and several exhibits were introduced. The Commission stated the issue to be "whether the use of a certain portion of the hospital facility as medical office space vitiates the tax exempt status of the entire facility." The Commission summarized the benefits of having offices within the hospital complex: to improve the quality of patient care, to provide consulting and follow-up services by specialists for emergency room treatment, to more economically use high-cost medical care equipment, and to reduce the number of full-time physicians, thereby cutting hospital costs.

The Commission concluded in its decision and order of September 26, 1977, that the evidence established that the use of the leased doctors' offices does not interrupt the exclusive use of the real estate for charitable purposes, and that it furthers, expedites, *dovetails into and rounds out* the charitable purpose of the hospital. It was noted that no profit is derived from the office rents and that the leased offices occupy only a small percentage of the hospital floor space. The Commission found that the entire hospital property was exempt from taxation and ordered the assessor to remove the property from the assessment rolls for the tax year 1976.

St. Louis County filed its petition for review in the circuit court and on February 10, 1978, the court affirmed the decision of the State Tax Commission. The County appealed to this Court.

Article X, § 6 of the Constitution of Missouri provides that "all property, real and personal, not held for private or corporate profit and used exclusively * * * for purposes purely charitable * * * may be exempted from taxation by general law."

Section 137.100, RSMo 1978, provides that "All property, real and personal, actually and regularly used exclusively * * * for purposes purely charitable and not held for private or corporate profit * * *" is "exempt from taxation for state, county or local purposes."

There can be no question, under the provisions of Article X, § 6, *supra*, and § 137.-100, *supra*, that only property which is used exclusively for purposes purely charitable can be held exempt from taxation. The difficulty arises when one poses the question: must the word "property" mean a building or tract *in its entirety* or may it mean a *portion* of a building or tract? Historically, this Court has held that the word "property" means a building or tract in its entirety—that buildings or tracts are indivisible for tax purposes.

In *Wyman v. City of St. Louis*, 17 Mo. 335 (1852), this Court held that where a building is used in part for a schoolhouse, and in part for other purposes, it is not exempt

from taxation; there cannot be a separate assessment for that portion which is used for other than school purposes.

In *State ex rel. Spillers v. Johnston,* 214 Mo. 656, 663, 113 S.W. 1083, 1085 (1908), this Court diluted the *Wyman* holding somewhat and said: "The phrase 'exclusively used' has reference to the primary and inherent use as over against a mere secondary and incidental use. * * * If the incidental use * * * does not interrupt the exclusive occupation of the building for school purposes, but *dovetails into or rounds out* those purposes, then there could fairly be said to be left an exclusive use in the school on which the law lays hold." (Emphasis supplied).

In *Barnes Hospital v. Leggett, Collector, and John O'Shaughnessy, Assessor,* 589 S.W.2d 241 (Mo. banc 1979), we concluded that the holdings in *Wyman* and *Spillers, supra,* and their progeny, should be overruled, and held that Mo.Const. art. X, § 6 and § 137.100, RSMo 1978, "authorize a partial exemption of a building or tract, where that building, or tract, is used in part for charitable purposes and in part for noncharitable purposes." We also held that the new *partial exemption* rule shall apply only to *Barnes* "and to all assessments which commence on the first day of January 1980, and thereafter." This means, of course, that the "dovetails into or rounds out" rule of *Spillers* shall apply in this case.

The State Tax Commission concluded that the use of the physicians' offices in the hospital dovetails into and rounds out the charitable use of the hospital. In our view, this conclusion is "authorized by law" announced in *Spillers,* and is "supported by competent and substantial evidence upon the whole record." Mo.Const. art. V, § 18.

The judgment is affirmed.

BARDGETT, C. J., and SEILER, WELLIVER, MORGAN and HIGGINS, JJ., concur.

RENDLEN, J., dissents.